15823.   UNITED STATES CASUALTY CO. *v.* SMITH.

1. Where upon the filing of an application by an employee for compensation under the workmen's compensation act the insurance carrier and the employee made a settlement by an agreement approved by the in-

dustrial commission, the insurance carrier, on the hearing of a subsequent application by the employee for a review of the settlement upon the ground of a change in his condition, was, in the absence of fraud, accident, or mistake, and in the absence of a reservation of such right in the agreement, precluded from raising the question of whether the original injury arose out of and in the course of the employment.

2. A stipulation in the settlement agreement, that the employer and the insurance carrier were relieved and forever discharged from all claims and demands whatsoever by reason of the original injury, did not bar such application for review, nor preclude an award thereon contrary to the stipulation.

3. The provision of section 25 of the act, to the effect that the right to compensation shall be forever barred unless a claim be filed with the industrial commission within one year after the accident, does not apply where the employee is seeking a review of an award or settlement, under section 45.

4. The industrial commission was authorized to find that the employee was suffering from the disease of blastomycosis, and that it resulted naturally and unavoidably from his original injury. The superior court did not err in refusing the insurance carrier's appeal.

DECIDED SEPTEMBER 11, 1925.

Appeal; from Fulton superior court—Judge E. D. Thomas. July 5, 1924.

Certiorari was granted by the Supreme Court.

*Harry L. Greene, McDaniel & Neely,* for plaintiff in error.
*Frank P. Stockton,* contra.

BELL, J. In June or July, 1921, C. L. Smith, as an employee of the International Vegetable Oil Company, was repairing a pipe in a well when water leaking out of a drain-pipe fell upon the back of his neck and caused a blister about the size of a nickel or a quarter. The blister was burst and became a sore. Some time in July or August of the same year the wound was exposed to ammonia gas, which enveloped him as he was repairing a pipe from which the gas was escaping. As described by the employee, it was not a "liquid gas," but was lighter than air, "and it will burn your hand to hold a pipe." "It will kill you if you get enough of it down in you. It will strangle you to death." His neck then commenced to give him trouble, and he was forced to remain away from his work for about a week, after which he returned to his employment and continued to work for approximately two months. He then quit on the advice of a physician, and was never able to work again.

On November 16, 1921, he made application to the industrial

commission for compensation under the workmen's compensation act. At the hearing of his application on November 25, 1921, he testified that he was injured by "being burned on the back of his neck by steam and poisoned by ammonia gas." At this time, it appears, his trouble was confined to his neck, except that he could not stand to be around gas or in a warm room, and was at times weak or fainty. At the close of this hearing the presiding commissioner appointed a physician to make a physical examination of the claimant and to report thereon. Before a decision was rendered the claimant made an application to submit further proofs, and a new hearing was ordered, to be held on December 29 following. On December 20 an agreement had been signed by the insurance carrier and the claimant, for the payment of compensation for nine weeks at the rate of $12 per week, in which it was stipulated that the *facts* and the amounts to be paid were "in strict accordance with the compensation law." The settlement was submitted to and approved by the commission and the case was apparently closed. The order of approval was dated December 30.

On August 18, 1923, the claimant moved for a review and modification of the previous award or settlement, on the ground of a change in his condition. This application was granted and a hearing was ordered for October 26 following. In this hearing it was developed, by the evidence, that the applicant's condition had continued to grow worse from the date of the settlement. Sores had appeared soon afterwards upon different parts of his person, similar to the one upon his neck. His general system appeared to be diseased, and one of his arms had become so affected that it was necessary to amputate it on July 4, 1922. Certain physicians testified that he was suffering from a disease known as blastomycosis. At the conclusion of this evidence it was found by the commissioner "that the claimant's injury arose out of and in the course of his employment, and that the disease of blastomycosis arose naturally and unavoidably from the accident suffered by the claimant in 1921." An award of compensation was made for 350 weeks (less the nine weeks covered by the settlement) at $12 per week. Upon a review by the full commission the finding and award by the sole commissioner were affirmed, the insurance carrier entered an appeal to the superior court, where the appeal was denied, and it excepted. Other facts are stated in the opinion.

1. It is contended that the commission erred in ruling that the approved settlement of December 29, 1921, closed the question as to whether the original injury arose out of and in the course of the employment, and in refusing to allow the insurance carrier to introduce evidence upon that issue. It is provided in section 19 of the workmen's compensation act of this State (Ga. L. 1920, p. 167) that settlements between an employee and employer are to be encouraged so long as the amount of compensation and the time and manner of payment are in accordance with the provisions of the act, but that a copy of the settlement agreement shall be filed with the commission, and shall not be binding until approved by the commission. See also section 55. The approval of the settlement is in the nature of a judgment, and necessarily implies, when there is no reservation to the contrary in the agreement, that the injury arose out of and in the course of the employment. The more especially is this true where the agreement stipulates that the facts were in accordance with the act. It might be possible for a settlement agreement to provide that the employer, or insurance carrier, was not committed to the proposition that the injury had arisen in and out of the employment, and in case of the approval of such agreement by the commission such issue would be open and subject to contest in the event of a subsequent application for a review or modification of the settlement on the ground of a change in the employee's condition. Whether or not the commission would approve a settlement agreement containing such reservation if submitted, it might not be unwise for it to do so, as such action might tend the more to encourage settlements and reduce litigation.

In any event, the agreement made by the insurance carrier and the employee in this case, when approved by the commission, was, so far as it related to the cause and circumstances of the original injury, the equivalent of a judgment to the effect that the injury was a compensable one, and it would not have been compensable unless it arose out of and in the course of the employment. In the absence of fraud, accident, or mistake in the making of the agreement, and in the absence of a reservation of such right, the insurance carrier was not entitled to be heard upon that question upon the application for a modification of the former award or approved settlement. Compare *Webster* v. *Dundee,* 93 *Ga.* 278 (3)

(20 S. E. 310) ; *Price* v. *Carlton,* 121 *Ga.* 12 (2) (48 S. E. 721, 68 L. R. A. 736) ; *Allen* v. *Allen,* 154 *Ga.* 581 (4) (115 S. E. 17) ; Bloomington D. & C. R. Co. v. Industrial Board, 276 Ill. 120 (114 N. E. 511) ; Pedlow v. Swartz Electric Co. (Ind.), 120 N. E. 603 ; Ætna Life Ins. Co. v. Shively (Ind.), 121 N. E. 50 ; 2 Schneider's Workmen's Compensation, 1270, § 500.

2. It is also insisted that the settlement could not be reviewed upon the ground of a change in condition, because of a further agreement, signed by the parties on December 29, and stipulating that the employer and the insurance carrier were forever relieved and discharged from all claims and demands whatsoever by reason of the injury. Assuming that this further agreement was duly approved by the commission, it was subject, however, to the terms of section 45 of the act, in which it is provided that upon the application of any party at interest on the ground of a change of condition, the industrial commission may at any time review any award or settlement made between the parties and filed with the commission, and on such review may make an award ending, diminishing, or increasing the compensation previously awarded and agreed upon. It will be observed that the commission has the same power to review a settlement on such application as it has to review an award, and the right of a party at interest to make the application is as clear in the one case as in the other.

It is the general rule that a party may waive that which the law has provided in his favor, and, in the light of this general principle, it might seem that section 45 makes an unwarranted encroachment upon the liberty of contract, but in the absence of any attack upon its constitutionality, it is to be treated as valid. And this is not to intimate that the section is invalid. Where parties voluntarily become subject to the workmen's compensation act, they enter an agreement which is, in a way, tripartite. The State becomes, as it were, a party thereto. The effect of it is that in the matter of compensation for injuries, falling within the terms of the act, the State, through the industrial commission, shall have the right, for cause, of revising even an approved settlement. In this view it would appear that since the provisions of section 45 were assented to by the employer and the employee as they respectively elected to operate under the act, this section, so far from being a restraint of the liberty of contract, was itself the subject of contract. The effect

of section 45 as thus established could be avoided only by the consent of all three of the parties to the agreement. Whether the industrial commission could make such release, it did not in this case even purport to release its power to revise the settlement. Nor does it appear that the employer and employee attempted to contract with reference to such matter.

We do not undertake to determine any question as to the constitutionality of the law, but make these observations only in support of the general proposition that the settlement agreement as approved by the commission was no bar to the application for further compensation on the ground of a change in condition.

A further reason why we conclude that the commission's ruling upon this point was right is that the agreement seems to have been a settlement only for the claimant's original injury of "being burned on the back of his neck by steam and poisoned by ammonia gas," without any intention or contemplation by the parties that it should include a future change in condition.

All that we have just said is on the supposition that the agreement for the release was duly approved by the industrial commission. Two agreements appear in the record, one dated December 20, 1921, and one dated December 29, 1921. The agreement prior in date is the one referred to in the first division of this opinion and contains no stipulation against a further claim. This was on one of the forms adopted by the industrial commission and appears in that part of the record which relates to the hearing on December 29, 1921, and is followed in the record by the commission's order of approval. The other agreement in which the parties stipulated as to such release is found only in the transcript of the evidence introduced at the final hearing on October 26, 1923. Although the commission's order referred to an agreement entered into on December 29, this could have been intended as the date of its submission. It is therefore not clear that the agreement for the release was ever approved by the commission. If it was not so approved it could not have had the force and effect contended for by the plaintiff in error irrespective of anything else we have said in this connection. In the absence of more certainty as to whether such agreement did have the approval of the commission, we would hardly in any view reverse the judgment merely because of such agreement. However, in our decision we have given the plaintiff

in error the benefit of the assumption that the agreement was duly approved by the commission.

3. A further contention is that the application for a review of the settlement was not made in the required time. Section 25 of the act provides that the right to compensation shall be forever barred unless a claim be filed with the industrial commission within one year after the accident, or within one year after death, if death results. The original application was made within time. Section 45, to which we have already referred, provides that an application for a review on the ground of a change in condition may be made at any time. Section 25 has no application where one of the parties, after award and settlement, is seeking a review under section 45.

4. The final question for determination is whether there was sufficient competent evidence to authorize the commission to find that the *disease* was one arising out of and in the course of the employment. Section 2 (d) provides that the term "injury" shall mean only injury by accident arising out of and in the course of the employment, and shall not include disease in any form except where it results naturally and unavoidably from the accident.

Having seen that the insurance carrier is concluded upon the question of whether the original injury arose out of and in the course of the employment, we have only to determine whether the disease from which the employee suffered resulted naturally and unavoidably from such injury. The claimant testified that the scald caused a blister which was burst by a fellow employee on the following day, and that it was irritated by his collar and made a sore. This was apparently some two or three weeks before his experience with the gas. Being asked on the trial whether he had "any boil there," he answered, "I have had pimples, pip-jennies." Q. "I am speaking about the time prior of this accident?" A. "To the best of my judgment I think I had a little pip-jenny on my neck at the time." Q. "Did you ever have anybody to mash this boil?" A. "I never had anybody to mash it, but some fellow come up and said, 'Look on your neck, let me mash it,' and he took his fingers and mashed it together." Q. "Was that before or after your neck got scalded?" A. "I can not swear it was before, but I can swear that there has been three more on my neck after I got scalded. I wouldn't have noticed those if it had not been for

Dr. Sage." Q. "Was this before you got the gas in it, or did he mash it before you got the gas in it?" A. "Yes, sir, I believe it was. I can't exactly tell, but I know that Red did mash a bump on my neck, just grabbed it and mashed it, just a little pin-jenny." Claimant also testified, however, that the place that was blistered by the hot water "was getting well and the ammonia gas blew out and got in it;" that he didn't pay much attention to it until that happened. His first notice that any other part of his person besides his neck was becoming involved was about the first of September, when he began to experience pains in his arm. Afterwards he could not stand to be around gas or in a warm room, and at times he was weak and fainty. In January of the following year sores appeared upon other parts of his person similar to the one upon his neck, and the disease made rapid progression until July 4, when one of his arms was amputated, and it had shown but little, if any, tendency to subside at the time of the last hearing by the industrial commission. The commission was authorized to find that the disease, whether previously existing, did not appear until after the exposure to the gas, but that it did appear and begin its inroads soon thereafter, notwithstanding considerably more than a year elapsed before it was identified. Dr. Cosby Swanson, a specialist in skin diseases, while not having seen the employee until November 8, 1922, more than four months after his arm had been amputated, testified that the employee, in his opinion, was suffering from blastomycosis, a disease which is caused by a vegetable germ or fungus. His evidence was to the effect that this disease is rare in this section of the country; that the average doctor in general practice "would go through a lifetime" and never see a case of it, and that it is observed infrequently even by specialists. To quote in part from his testimony: "It has only been the past few years noticed in this section at all, but out in the southwest and western parts of the country it is more prevalent than in this section. All about the disease is not known, but we do know that such a disease exists, and exists in Georgia. I have seen several cases of it the past year. Now for the entrance of this organism, . . all you have got to have is a break in the skin or mucous membrane. It enters in through that channel, and it is spread over the entire system of the circulation of the blood. . . And thus it may flow through the system for days or weeks, we don't

know how long. . ." The witness was asked: "Would you say that your diagnosis, made at the time it was,—is it possible for that condition to have existed for two or three years prior to that time?" His answer was: "Yes, it is possible, for it is possible for it to have existed twenty years prior to that time." It was Dr. Swanson's opinion that if the employee "got a burn on his neck and the ammonia gas later irritated it, this would be a place open for infection, and that infection might enter and cause the loss of his arm," and that "this blastomycosis could develop naturally from the entrance of the germ at this burned place on his neck," or "might be due to the sore on his neck." It is to be observed at this point that Dr. Swanson did not give an unequivocal opinion that the germ entered at any particular place on the employee's person. Dr. Armstrong, another witness for the employee, was the physician and surgeon who amputated the arm. He had not determined what the trouble was at the time of the operation, but "went ahead" because "the man's life was in danger." The patient was afterwards sent by him to Dr. Swanson. On later being informed of Dr. Swanson's opinion that the disease was blastomycosis, he made a further study of the case and of the medical authorities and arrived at the same conclusion.

Dr. Sage first saw the employee on January 27, 1922, about six months after his original injury and about five months before the amputation of his arm. He treated the employee for other diseases, but to no avail. On learning long subsequently of Dr. Swanson's diagnosis he also "read of the thing" and agreed with Dr. Swanson's opinion. The statements of both Dr. Armstrong and Dr. Sage were stronger than Dr. Swanson's with respect to the site of the germ's entry into the claimant's person, the testimony of each of them being that it was the burned place on his neck. It appears that all three of the physicians had properly before them an ample history of the case in reaching their conclusions and in giving their testimony. It can not be said that the opinion stated by Doctors Armstrong and Sage, to the effect that the germ entered the burned or sore place on the employee's neck, was to be disregarded merely because they had depended upon Dr. Swanson for the original diagnosis, since it is shown that they afterwards, by their own study and by the application of their general knowledge as medical men, verified Dr. Swanson's conclusion. They were

duly qualified as experts, and it was entirely proper to consider their testimony. Nor should the testimony of one or both of them to the effect that the loss of the employee's arm was "due" to the trouble on his neck be absolutely discarded as being an improper attempt to decide the case or to usurp the function of the industrial commission in determining whether the disease resulted naturally and unavoidably from the accident. The ruling of the Supreme Court in *Travelers Insurance Co.* v. *Thornton,* 119 *Ga.* 455 (1) (46 S. E. 678), was in reference to the admissibility of testimony over objection, whereas the testimony here referred to was admitted without objection, and, in light of the other evidence of the witness or witnesses giving it, could have been considered as a mere expression of opinion on the question of fact as to the manner in which the disease was contracted. Each of the physicians testified that it was not probable that the germ should have entered through a "boil or pip-jenny," because of the small opening, and that the entry was the more likely made through the larger surface of the burn or sore. Furthermore, the pimple must have healed, as it does not appear at any time to have caused any particular concern. All were agreed that the ammonia gas would not carry the germ, but that the employee's experience with it could have lowered his resistance so that the organism (to quote Dr. Swanson) "would get in, grow, and develop." "If he got a burn there, of course the resistance was lowered from the results of the burn, and these organisms could enter and develop faster there." It appeared from the testimony of one of the physicians that the blastomycosis germ exists, more likely than elsewhere, about cattle, dead trees, and straw. There was no testimony that it was probably present at or about the employee's place of work.

It is not clear in the record whether the physicians, in testifying as to the "burn," referred merely to the scald, or to the injury as it existed following its contact with the gas, but, from the circumstances that the employee continued to work notwithstanding the scald and observed no failure in his health until after his exposure to the gas, and that his trend was downwards from a short time subsequently thereto, and that, with the exception of the scald and a possible pimple, he had been previously well and sound, and from the entire testimony of the physicians, the commission was amply authorized to find that the employee was suf-

fering from blastomycosis caused by the entrance of the germ at the sore on his neck, and that the entry followed the employee's exposure to the ammonia gas. Whether the legal result should have been different if it had been equally inferable that the germ was received into the employee's system prior to the occasion when he was gassed, as when the blister from the scald was burst by a fellow employee, or through a boil or pip-jenny, which the employee, it seems, might have had after he was gassed, need not be decided, because the evidence could have been found to point more strongly to the other conclusion, as just stated. There is nothing, however, to show when, where, or under what circumstances the contact with the germ was had, except that the inference was authorized that it occurred shortly after such exposure to the gas. It is evident that Dr. Swanson, in testifying that it was possible for the germ to have been present in the employee's system for twenty years, meant to express a mere possibility, and not a probability, and, besides, as we have seen, the testimony of the other physicians was to have been considered. Under these circumstances, was the commission warranted in finding as a matter of fact that the disease resulted naturally and unavoidably from the accident, without more definite evidence as to when, and with no evidence whatever as to where or under what circumstances the disease was contracted?

The language of our statute is similar to that in the New York statute as to when a disease may be considered an injury arising out of and in the course of the employment. If the compensation act of any other State has employed such language, it has not been called to our attention, and we have found no decision, even by the New York courts, wherein the meaning of such language has been declared. Many cases have been cited by both sides and all of them have been examined carefully. There are decisions which might be construed as holding that the contention of the employee in a case of this sort would not be established in the absence of evidence to show when, where, or under what circumstances the germ made its entrance into his person. But, after mature deliberation, we are unwilling to apply such a rule in this case. The statute, in providing that the disease must have resulted naturally and unavoidably from the accident, does not, we take it, abolish the well established proximate-cause doctrine, but

does define it, we think, so far as it relates to diseases, in compensation cases. The definition, however, does not appreciably change the general rule, and might have been inserted for the purpose of excluding diseases developing in the course of the employment but not caused by some antecedent injury. See 28 R. C. L. 794. The word "naturally," as here employed, means according to the laws of nature or the usual course of things. It is unimportant that it is unusual for persons to be afflicted with the disease in question, provided it seized the particular person in the way usual to the disease. According to the evidence as to the character, habits, and effect of the blastomycosis germ, the employee's contracting of the disease was in accordance with its nature, and it therefore resulted naturally from the accident. Did it also result "unavoidably?" This word is to be given a reasonable interpretation, according to its general acceptation, having in mind the general requirements of the law as to the care and diligence which a person ordinarily must exercise for his own safety and protection. It is not employed in an absolute sense, and does not imply that the disease must follow certainly. A thing is generally considered unavoidable when common prudence and foresight can not prevent it. The evidence showed that the employee consulted physicians promptly, and was constantly under treatment, and warranted the conclusion that he made every reasonable endeavor to maintain his health from the first appearance of illness. Anyway, there would be no presumption of voluntary exposure or lack of care on the part of the employee. *Woolworth* v. *Wood, 32 Ga. App.* 575 (2). The evidence was easily sufficient to establish that he could not have avoided the disease by ordinary care. It is immaterial that neither the employer nor the employee could have known that the particular disease might result from such an accident, since, in the light of modern science and common experience, it could have been reasonably anticipated that a disease of some character would probably result therefrom. A disease results naturally and unavoidably from an injury, within the meaning of the statute, when it is contracted in a way that is natural to the disease, and when it could not have been avoided by the victim through the exercise of reasonable care and caution.

Although we were at first of a different opinion, we have finally concluded that there was evidence to authorize the industrial com-

mission in making the award complained of, and that the superior court did not err in refusing the insurance carrier's appeal. See, in this connection, *Early* v. *Hampton,* 15 *Ga. App.* 95 (2) (82 S. E. 669) ; *Clements* v. *State,* 141 *Ga.* 667 (1) (81 S. E. 1117) ; *Bell* v. *State Life Ins. Co.,* 151 *Ga.* 57 (105 S. E. 846) ; *Southern Ry. Co.* v. *Webb,* 116 *Ga.* 152 (1) (42 S. E. 395, 59 L. R. A. 109) ; *Bell* v. *State Life Ins. Co.,* 24 *Ga. App.* 497 (101 S. E. 541) ; 22 R. C. L. 150-1, §§ 33, 34; 8 Words and Phrases, 7147; 4 Words and Phrases (2d Series), 1040; Allison *v.* City of Fredericksburg, 112 Va. 243 (71 S. E. 525), and especially the cases cited in the note to that case in 48 L. R. A. (N. S.) 94-99; State *v.* James (Minn.), 144 N. W. 216; Cline *v.* Studebaker Corporation (Mich.), L. R. A. 1916C, 1139, 155 N. W. 519; Bayne *v.* Riverside Storage & Cartage Co. (Mich.), 148 N. W. 412; Canadian P. R. Co. *v.* Flore, 24 D. L. R. 710.

Among the authorities which have been relied on by able counsel for plaintiff in error for the proposition that the disease was not shown to have been one for which the employer or insurance carrier should be liable are the following: McCoy *v.* Michigan Screw Co. (Mich.), 147 N. W. 572; Voelz *v.* Industrial Commission (Wis.), 152 N. W. 830; Jefferson Printing Co. *v.* Industrial Commission (Ill.), 144 N. E. 356; Travelers Ins. Co. *v.* White (N. Y.), 191 App. Div. 6; Eldridge *v.* Endicott, 228 N. Y. 21 (126 N. E. 254, 20 A. L. R. 1) ; Powers *v.* Alpert, 223 N. Y. 97; Manley *v.* Artistic Metal & Roofing Co., 205 N. Y. Sup. 687; Bloch *v.* Contact Process Co., 207 N. Y. Sup. 376; Freeman Coal Mining Co. *v.* Industrial Commission (Ill.), 145 N. E. 615.

Whether it might not be possible to distinguish some, if not all, of these cases from the one at bar, our conclusion is, as stated, that the award in the instant case was authorized and that no error was committed.

*Judgment affirmed. Jenkins, P. J., and Stephens, J., concur.*